# STUBBLEFIELD *v.* STUBBLEFIELD.*

---

SPECIFIC PERFORMANCE.

1. Specific performance, not being of absolute right, a court of equity will

---

*Specific Performance.*—For a discussion and presentation of authorities as to specific performance of contract for sale of stock in corporation, see note to *Ryan* v. *McLane,* 50 L.R.A. 501.

not decree it in a given case, unless the complainant has discharged the burden of proof resting upon him, and has clearly established the contract which he seeks to have executed. (Following *Lipscomb* v. *Watrous*, 3 App. D. C. 1.)

2. In a suit to enforce specific performance of an alleged contract for the sale of corporate stock, the testimony reviewed, and a decree dismissing the bill of complaint *affirmed*, on the ground that the offer by the defendant to sell the stock was conditioned upon immediate payment therefor; that the terms of the offer were not complied with by the complainant; and that the offer was thereupon withdrawn by the defendant.

No. 1961. Submitted December 8, 1908. Decided March 2, 1909.

HEARING on an appeal by the complainant from a decree of the Supreme Court of the District of Columbia, holding an equity court, dismissing a bill for specific performance.

*Affirmed.*

The facts are stated in the opinion.

*Mr. Jas. S. Easby-Smith* and *Mr. Howard Boyd* for the appellant.

*Mr. A. E. L. Leckie,* *Mr. Creed M. Fulton, Mr. Joseph W. Cox* and *Mr. Charles A. Douglas* for the appellees.

Mr. Justice ROBB delivered the opinion of the Court:

This is an appeal from a decree of the supreme court of the District dismissing the bill of complaint of appellant, Thomas W. Stubblefield, for the specific performance of an alleged contract for the sale of 100 shares of stock belonging to appellee, Lee A. Stubblefield, in the Stubblefield Banking & Trust Company, a corporation.

The evidence on the part of the complainant tends to show that the Stubblefield Banking & Trust Company, of which he was the controlling spirit, commenced business in 1902; that subsequently complainant gradually bought in the stock of the corporation, so that, at the time of the inception of this con-

troversy, he had acquired a large part of it; that on the 29th of March, 1907, Mrs. Knight, a sister of complainant and the defendant, called upon complainant and informed him that his brother, Lee (the defendant), was willing to sell his stock for 50 cents on the dollar; that he accepted the offer, and that he inquired of his sister whether his brother was in any hurry for the money, and that his sister replied in the negative; that on April 3d, following, his brother talked with him over the telephone, and informed him that one Payne, who controlled a block of stock, was in town, and that he thought complainant would be able to acquire said Payne's stock; that the defendant in this conversation wanted to know if complainant would release him from the agreement which had been negotiated by Mrs. Knight for the purchase of defendant's stock; that complainant subsequently saw said Payne and acquired his stock, paying him $29,000, par value, therefor; that on April 4th Mrs. Knight called on him and asked when he would be ready to pay over the $5,000 for defendant's stock; that he told her that he had intended to go down to the bank the day before and arrange the matter, but that Mr. Payne's coming had interfered, but that he would go down on the following day and get the money and pay it over; that on April 9th he received the following telegram from Payne:

T. W. Stubblefield,
        Washington, D. C.
    Can trade Alabama property for Lee's stock.   Can we make same arrangement or some other?   Am going to New York next week and will stop there.   Please answer.
                                        J. A. Payne.

That he attempted to telephone Mrs. Knight on the evening of that day, but was unable to communicate with her; that on the next day, the 10th, he telephoned her and asked her to come to the bank and get the money for his brother's stock, and she came on the evening of the 10th, but did not bring the stock with her; that he directed a check for $5,000 to be drawn and

made payable to his brother, and that he delivered the same to Mrs. Knight; that at the same time he directed the following receipt to be drawn, and, after reading it to his sister, procured her to sign it:

Washington, D. C. April 10, 1907.

Received of T. W. Stubblefield Check No. 259 of the Fourteenth Street Savings Bank on the Commercial National Bank, for the sum of Five Thousand Dollars ($5,000), to be paid to Lee A. Stubblefield in full settlement for his one hundred (100) shares of the capital stock of the Stubblefield Banking & Trust Company, as per agreement of March 30, 1907, and also further agreement of April 4, 1907.          F. S. Knight.

That on the following day, April 11th, he wired Payne as follows:

Washington, D. C., Apl. 11.

John A. Payne,
    Hotel Lackman, Cincinnati, O.

Lee sold stock to me under agreement of March 30th. If you buy, you are buying stock that belongs to me.
          T. W. Stubblefield.

—and that the check to his brother was subsequently returned to him, and the agreement repudiated.

The defendant testified in substance that the relations between himself and his brother had become somewhat strained, owing to difficulties over the management of the Banking & Trust Company, and that he had been importuned by members of his family, including his sister, Mrs. Knight, to sell his stock to his brother for $5,000, and thus end the controversy between them; that on Friday, March 29th, he, being in need of ready money, said to Mrs. Knight, who had again brought up the subject: "All right. Tell him I will take $5,000 if you can get it in cash;" that he needed the money the next day, but could have used it Monday, April 1st, and so informed his

sister; that he turned over the stock to Mrs. Knight about the 29th of March; that on Tuesday, April 2d, he received a telegram from Payne requesting an interview; that on Wednesday, the 3d, he had an interview with Payne, and telephoned his brother that he believed there was a good opportunity to come to an understanding with Payne in reference to his stock; that he also said: "Tom, the deal that you and Fannie was speaking of is off, as you didn't close it on Saturday or Monday. The deal is off, and I am going to trade my stock to Payne for his interest in the joint property we own in Bessemer;" that his brother made no response to this; that on April 7th he received a letter from Payne, and gave Payne an option on his stock until Tuesday the 16th; that upon ascertaining from his sister, Mrs. Knight, that she held complainant's check, he declined to receive the same and indorsed on the letter he had received from Payne the following:

Tom,
    I have given Payne an option on this stock till Tuesday the 16th inst., 1907. I phoned you to that effect while he, Payne, was here. If not closed Tuesday, the stock is yours.

                                        L. A.

    This Mrs. Knight delivered to complainant, who returned the same by her with the following indorsement:

    I telegraphed Payne that I had purchased the stock.

                                        W. S.

Whereupon defendant declined to deal further with his brother.

    Mrs. Knight, who acted as a peacemaker in this unfortunate controversy between two brothers, and whose testimony shows her to have been actuated with the best of motives and to be a reliable witness in every way testified in part as follows:

    I knew that my brother Thomas was trying to acquire Lee's stock for 50 cents on the dollar, and that Lee had refused and

was trying to persuade him to settle matters between them in reference to the Banking & Trust Company. Estranged relations sprung up between them, and Lee was threatening to bring suit to force a settlement. To avoid any trouble like this, any family difficulty, myself and mother and sister tried to persuade Lee to accept the 50 per cent from Tom. * * * On the 29th of March, my brother Lee stated to me that he had immediate use for some money, and that in order to avoid any trouble with Tom he would accept the $5,000 for the stock, provided he would pay cash for it. I was anxious to bring about peace, and so I went to Tom and told him this, and Tom says—

*Q.* When did you go to Tom?

*A.* This was the 29th of March.

*Q.* State what you told Tom.

*A.* I went to Tom and told him what I had heard Lee say, and he said, "Very well, I will send him a check in the morning or Monday," which would have been the 1st of April. I returned and told Lee what Tom had said about sending the check. I saw no more or heard no more of the matter until the 10th of April.

She testified, further, that when she received complainant's telephone message of the 10th of April she attempted to communicate with her brother Lee, the defendant, and, failing to get him, "went without hearing from Lee one way or the other;" that she did not understand the paper she signed to be binding in any way upon the defendant, and in signing it overlooked the allusion to the alleged interview of the 4th, which she was positive did not occur. She was asked whether she told complainant in the interview of March 29th that she did not think the defendant was in need of the money, and answered: "I am sure that I did not, because I had told him that he wanted it at once."

Without further analysis of the testimony, all of which we have carefully examined, we conclude that the offer which the defendant authorized his sister to make to the complainant, and which was in fact made by her to him, was conditioned

upon the immediate payment for the stock; that the terms of this offer were not complied with; and that the defendant on Wednesday, April 3d, notified the complainant in substance that the offer was withdrawn, and that any subsequent interview between the complainant and Mrs. Knight was without authority of the defendant, and hence not binding upon him.

Assuming the accuracy of complainant's recollection of his interview with Mrs. Knight on the 4th of April, his testimony in respect to that interview tends to support Mrs. Knight's testimony relating to the interview of the 29th, for complainant admits that on the 4th he was explaining why he had not previously sent his brother the money. Having in mind Mrs. Knight's anxiety to end the controversy between her brothers, it is impossible to account for her failure promptly to surrender the stock to complainant upon any other reasonable theory than the one given by her, namely, that, the conditions of the original agreement not having been complied with, she considered it necessary, before surrendering the stock, to secure the consent of the defendant. She was acting in good faith. Not so the complainant. He attempted to gain possession of his brother's stock, which was in his sister's keeping, by suppressing from her information concerning said interview of April 3d, which he well knew would prevent her from surrendering it.

Specific performance not being of absolute right, a court of equity will not decree it in a given case unless the complainant has discharged the burden of proof resting upon him, and has clearly established the contract which he seeks to have executed. *Colson* v. *Thompson,* 2 Wheat. 336, 4 L. ed. 253; *Hennessey* v. *Woolworth,* 128 U. S. 438, 32 L. ed. 500, 9 Sup. Ct. Rep. 109; *Lipscomb* v. *Watrous,* 3 App. D. C. 1.

Tested by this rule, it is manifest that the evidence in this case falls far short of entitling the complainant to the relief sought.

The decree is affirmed, with costs.        *Affirmed.*